**This order is SIGNED.**

**Dated: July 14, 2016**



**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**




**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF UTAH**

| In re: | Bankruptcy Number: 14-33102 |
|---|---|
| David Randall Sabey, | Chapter 7 |
| Debtor. | Judge R. Kimball Mosier |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Two competing motions came before the Court on March 16, 2016. The motion of Elizabeth R. Loveridge, the chapter 7 trustee (Trustee), seeks the Court's approval of a settlement agreement. The motion of Bank of the West (Bank) seeks the Court's approval to resume prosecution of a pre-petition lawsuit to recover property for the benefit of the chapter 7 estate. The competing motions are related because the Trustee's settlement proposes to settle the same controversies which are the subject-matter of the Bank's prepetition lawsuit. The Court elected to consider the Trustee's motion first and took evidence on March 16, 2016 and March 22, 2016. The Court denied the Trustee's motion to approve settlement without prejudice and gave the Trustee until April 22, 2016 to file a renewed motion. A renewed motion to approve

settlement was timely filed by the Trustee, and the Court took evidence[1] with respect to the Trustee's renewed motion to approve settlement on May 24, 2016.

## JURISDICTION

This Court has jurisdiction over this bankruptcy proceeding pursuant to 28 U.S.C. § 157(a) and (b) and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (G), and (O) and the Court may enter a final Order. Venue is appropriate under 28 U.S.C. § 1408.

## BACKGROUND

David Randall Sabey (David) filed his chapter 7 bankruptcy petition on December 15, 2014. During her administration of the case, the Trustee became aware of certain alleged pre-petition transfers from David to his wife, Candace Sabey (Candace) and to David's mother, Karleen Sabey (Karleen). A settlement agreement[2] (Settlement Agreement) was reached between the Trustee, Candace and Karleen. The Bank objects to the Settlement Agreement and argues that instead of approving the Settlement Agreement, the Court should grant the Bank's motion for leave to resume it's pre-petition lawsuit (State Court Lawsuit). The subject matter of the State Court Lawsuit and the Settlement Agreement are the same. Both address an alleged 2005 transfer of David's one-half interest in David's and Candace's home (Home) to Candace, a 2009 transfer of David's interest in certain LLCs to Candace, a transfer of land in Summit County, Utah to

[1] All parties agreed that the evidence accepted by the Court at the hearing of March 16, 2016 will be a part of the official record of the hearing conducted on May 24, 2016.

[2] The Court refers to the "Trustee's Renewed Motion to Approve [Amended and Restated] Settlement Agreement with Candace Sabey" (Docket #76) as the "Settlement Agreement" throughout this document.

Karleen, David's assignment of his member interest in Beehive Grill to Karleen, and the assignment of David's interest in a 2009 promissory note to Karleen.

To evaluate the advisability of entering into the Settlement Agreement, the Trustee and her attorney amassed documents and information from many sources and conducted several telephone conversations with George Pratt (Pratt), the Bank's attorney, David Castleberry (Castleberry), Candace's attorney, and Matt Boley (Boley), David's attorney. The Trustee's investigation and her discussions and with the attorneys led the Trustee to review and consider the documents which are marked into evidence as Trustee's Exhibits A-V, and Trustee's Exhibit O-1.

**1. The Claims Against Candace**

After her investigation, the Trustee concluded the following. David and Candace are married and purchased the Home sometime in the 1990s. In the 2000s, David and Candace worked on an estate plan with attorney Thomas Christensen (Christensen) a member of the law firm of Blackburn and Stoll. In 2005, as part of their estate plan, and on Christensen's recommendation, David conveyed his interest in the Home to Candace by a quit-claim deed recorded on April 14, 2005. After conveying his interest, David continued to live in the Home, and both David and Candace continued to use the Home as collateral for loans. David and Candace both contributed towards household expenses such as insurance, utilities, maintenance and repair. David and Candace filed joint tax returns, and in some years, David claimed a home-office expense deduction. Both David and Candace live in the Home today.

In 2009 David assigned his interest in several limited liability companies to Candace, including his interest in Moab Brewers LLC and Moab Brewhouse LLC, and at the same time

retained a 100% interest in several limited liability companies for himself. David's transfer of the LLCs was a part of David and Candace's estate plan that was recommended to them by Jay Bell who was their estate planning attorney at that time. At the time of the 2009 LLC transfers, David and Candace believed that the value of the LLC interests conveyed to Candace were roughly equivalent to the value of the LLC interests retained by David. The LLCs which David retained for himself were LLCs engaged in real property development and eventually lost all of their value. The LLC interests transferred to Candace have been actively managed by Candace and continue to be valuable. Although the documents assigning the Moab Brewhouse, LLC and Moab Brewers LLC interests to Candace are dated November 2009, the Utah Division of Commerce records were not changed to reflect Candace as the holder of the interests until October 2013.

David and Candace's joint Personal Financial Statement dated September 30, 2009, lists the Home as an asset, but David's individual Financial Statement dated September 30, 2009, does not list the Home as an asset. Candace lists the home as her asset. Both financial statements show that Candace and David were solvent in September of 2009. The Trustee believes that the Bank may have had possession of the David's individual Financial Statement dated September 30, 2009, because a "BOTW" Bates stamp is found on the statement.

The Trustee considered Candace's claim that the transfers were part of their estate plan, and that David did not intend to retain an interest in the Home. The evidence reviewed by the Trustee includes a correspondence from David and Candace's estate planning attorney, various emails regarding the estate planning, related estate planning documents, transfers to David of equivalent value, and Candace's active management of the LLCs that were assigned to her.

The Trustee considered the Bank's arguments that the transfers were fraudulent transfers and that David intended to retain an interest in the Home and the LLCs and for that reason, the court should impose a resulting trust on the Home and LLCs for the benefit of David's creditors. The Trustee considered the Bank's argument that notwithstanding the transfers, David continued to live in the Home and pay household bills, that Candace received distributions from Moab Brewers and Moab Brewhouse but deposited the money in joint accounts, that David and Candace used the Home as collateral for loans, and that David claimed a home business deduction on the couples joint tax returns.

The Trustee considered Candace's argument that David was solvent at the time of both transfers and that the statute of limitations has run on both the 2005 transfer and the 2009 transfers. The Trustee also considered the Bank's counter-argument that the statute of limitations for the resulting trust on the Home and the LLCs did not begin to run until David disclaimed his interest in the Home and LLCs when he filed bankruptcy, and Candace's reply that David disclaimed his interest in the Home when he signed and recorded the 2005 deed and disclaimed the Home again with his 2009 Financial Statement.

The Trustee estimates the value of Home to be between $500,000 to $700,000. The Trustee has not valued the limited liability company interests, but she is aware that the limited liability companies regularly make distributions to members, that the transferred interests are minority interests, and that there are restrictions on transfer that would affect the value. Because Candace continues to own both the home and the LLCs, if the estate avoids the transfers or imposes a resulting trust, it could only acquire David's ½ interest in the assets.

The Trustee reviewed documents that show the value of property transferred to Candace

in 2009 was roughly equivalent to the value of property transferred to David at the same time, and the Trustee reviewed a loan agreement dated August 2008 between Bank, David and Candace showing that the Bank lent $750,000 David and Candace, and took a Revolving Credit Deed of Trust dated August 12, 2008 showing Candace was the owner of Home.

The Trustee considered that her claims may be barred by the applicable statute of limitations, and that although the claims against Candace are meritorious, there is a significant chance that the Trustee may not prevail in litigation to avoid the transfers or impose a resulting trust.

**2. <u>The Claims Against Karleen</u>**

The Trustee's review included information that in the early 1990s David and Karleen formed a limited liability company called Alberta Land Co, LC (Alberta) and that each of them owned a 50% membership interest in the company. In 1992 David purchased land in Summit County, Utah described as Lot 21 Rockport Ranches (Lot 21) for $3,300, and took title to the land in his name. Even though title was in David's name, Alberta listed Lot 21 as an asset on its books and records from 1992 forward. Alberta paid the Lot 21 property taxes each year and paid the owners' association fees each year.

In 2009 David, Karleen and seven other members formed a company called the Beehive Grill, LC (Beehive). Karleen owned 11.25% of the member interests. David owned 22.5% of the member interests. Beehive operated a restaurant in Logan, Utah for approximately five years. During that time it never paid a distribution to members but did make several capital calls on members.

In 2009 David purchased a piece of restaurant equipment for Beehive and in exchange, Beehive executed a promissory note payable to David for $25,000 (Beehive Note). Beehive promised to repay the money before June 5, 2011. In 2012 Karleen agreed to loan money to David, and on January 15, 2012, David signed a note payable to Karleen for $42,500 (Jan 15, 2012 Note) which was to be repaid by July 2013. The Jan 15, 2012 Note was secured by David's ownership interest in Beehive, David's ownership interest in the Beehive Note, and David's interest in Lot 21. During this same time period, Lot 21 and several other lots in the subdivision were burned by a wildfire. David could find no recent sales of lots in the subdivision but did find a few lots listed for sale at $30,000. The assessed value of the lot in 2014 was $41,190.

David was unable to repay the Jan 15, 2012 Note, so on July 1, 2013 he quit-claimed his interest in Lot 21 to Karleen, and on July 15, 2013 he assigned his membership interest in Beehive and his ownership interest to the Beehive Note to Karleen. The value of David's interest in Beehive and the value of the Beehive Note appears to be minimal because Beehive had little value. Beehive had a lease agreement with an initial term of 10 years and obligated Beehive to pay an annual rent of $69,500. Because the restaurant business was not generating enough revenue to pay rent and other operating expenses, in 2014, Beehive's owners transferred ownership of Beehive to the landlord. In return, the landlord paid Beehive's owners approximately $40,000, which was the value of the inventory on hand at the time of the transaction.

In the State Court Lawsuit, Bank filed a motion to amend its Complaint to assert claims against Karleen. The proposed amended complaint alleges that David's quit-claim of Lot 21, his assignment of his member interest in Beehive, and his assignment of the Beehive Note to

Karleen were fraudulent transfers made with actual intent to hinder, delay or defraud the Bank under Utah Code Ann. § 25-6-5. The amended complaint alleges that the Bank's claims against David arose before the transfers, the Bank had sued David before the transfers to Karleen, that Karleen was an insider, and that David was likely insolvent at the times of the transfers.

The Trustee found no evidence that the transfers were concealed, and considered evidence that the $42,500 loaned to David by Karleen exceeded the value of the property transferred to Karleen. The Trustee also considered that Karleen is 90 years old and lives in Canada, that service of a summons and complaint on a resident of a foreign country can be difficult, that the property transferred to Karleen, if recovered, may be difficult to liquidate and that Alberta or Karleen may assert an equitable ownership claim to Lot 21. Beehive is out of business rendering the Beehive member interest and the Beehive Note worthless.

**Other Considerations**

The Trustee's testimony is that she believes that the litigation would be expensive, complex, and that she would face a heightened burden of proof attempting to impose a resulting trust on the Home and LLCs. The Trustee considered that the Bank's State Court Lawsuit was commenced in May 2014, that the State Court Lawsuit may be barred by the statute of limitations. The Defendant's contend that the Bank was put on notice of the transfers in 2005, 2008 and 2010. When the Home was used as collateral for loans, it was clear that the home was titled in Candace's name.

The Trustee testified that the estate has no money to pay for litigation or expenses. She did not give much weight to the difficulty in collecting the judgment but does believe that reducing the judgment to cash may be time consuming, expensive, or not economially feasible.

The Bank is one of two significant creditors in the bankruptcy proceeding, and the Bank opposes the Settlement. The second largest creditor in the case supported an earlier settlement that proposed to pay the estate $50,000. The Trustee believes that the $100,000 offered in the Settlement Agreement is significant, valuable and is in the best interest of the estate and the creditors.

**ANALYSIS**

Factors to be considered when approving a settlement include: (1) the probable success of the litigation on the merits; (2) the possible difficulty in collection of a judgment; (3) the complexity and expense of the litigation; and (4) the interests of creditors.[3] The Trustee has addressed each of the above factors. When considering a settlement agreement, " '[A] court's general charge is to determine whether the settlement is fair and equitable and in the best interests of the estate.' '[T]he court should, without conducting a trial or deciding the numerous questions of law and fact, review the issues and determine whether the settlement falls below the lowest point in the range of reasonableness.' "[4]

The principal concern identified by the Trustee with respect to the State Court Lawsuit is the Trustee's belief that she may not prevail in the lawsuit. To succeed, the Trustee would need to first carry her burden of proof as to the fraudulent conveyance and resulting trust claims. The proof required to impose a resulting trust must be strong, clear and convincing, such as to leave

---

[3] *Rich Dad Operating Co. v. Rich Global*, No. 15-8103, 2016 WL 3397685 (10th Cir. June 14, 2016) (unpublished), *In re Kopexa Realty Venture Co.*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997).

[4] *Rich Dad* at 6.(citations omitted).

no doubt of the existence of the trust, and that it is the intention at the time of the transfer and not at some subsequent time.[5]

The Trustee believes that statute of limitations may be a defense to her resulting trust claims. The parties agree that the correct limitation statute with respect to the Bank's resulting trust argument is found at U.C.A. § 78B-2-307, which is a four year statute of limitation. A statute of limitations period generally begins to run upon the happening of the last event necessary to complete the cause of action.[6] Utah Courts apply a "discovery rule" for the benefit of a plaintiff which tolls the period of limitations until the discovery of the facts forming the basis for the cause of action.[7]

The Tenth Circuit has addressed the statute of limitations for a resulting trust action under Utah law. In *Taylor*, the debtor had transferred his home to his wife approximately seven years before he filed bankruptcy. The bankruptcy court concluded that the debtor retained an equitable interest in the home and the statue of limitations did not begin to run until he repudiated that equitable interest when he filed his bankruptcy schedules and claimed no interest in the home. Relying on *Baker v. Patte*,[8] the Tenth Circuit determined that under Utah law, the statute of limitations with respect to resulting trusts is intertwined with the substantive question whether the trustor had an equitable interest in the trust property. "If ... [the debtor] retained an equitable interest, under Utah law the statute of limitations would not have run until he took an

---

[5] *In re Taylor*, 133 F.3d 1336, 1341 (10th Cir. 1998) (citations omitted).

[6] *Berenda v. Langford*, 914 P.2d 45, 50 (Utah 1996).

[7] *Id* at 51.

[8] 673 P.2d 590 (Utah 1983).

action to repudiate that interest when he filed his bankruptcy schedules. If, however, [the debtor] did not retain any equitable interest, then the trustee would not be entitled to recover in any event."[9] In the present case, if David retained an equitable interest in the home, the statute of limitations did not begin to run until he filed his bankruptcy schedules. If David did not retain an equitable interest in the home, the Trustee would not be entitled to recover in any event.

Although the Court believes that the Trustee has placed unnecessary emphasis on the statute of limitations defense, her concerns about ultimately prevailing on a resulting trust claim are very justified. The Bank contends that David intended to retain an interest in the Home because he continued to live in the Home, contributed to household bills, helped pay real estate taxes, the Home was used as collateral for loans, and David claimed a home business deduction on their joint tax returns. In *Taylor*, the Tenth Circuit reversed the bankruptcy court's factual findings and its imposition of a resulting trust on similar facts. The Tenth Circuit rejected the application of a "per se rule that when a husband conveys to his wife his interest in the home but intends to continue to reside there and help pay real estate taxes, insurance, and other household bills that accrue, he intends to hold a fifty percent beneficial interest in the property. As a practical matter such a rule would prevent transfers of title to the home between spouses to accomplish such objectives as avoiding probate and arranging the two estates to take advantage of estate and inheritance tax laws exemptions."[10] Many of the facts in this case are more favorable for Candace than the facts in *Taylor* and the Court concludes that the Trustee's

[9] *Taylor* at 1340.

[10] *Id* at 1342.

determination that there is a significant chance that she may not prevail on a resulting trust claim is reasonable.

The Trustee's conclusion that there is a substantial likelihood that she may not prevail on a fraudulent conveyance claim is also reasonable. At the time David and Candace divided their assets they appear to have been financially solvent. And although the business assets David received eventually lost their value, each received assets that had substantial value at the time they were divided.

The Trustee's conclusion that there is a substantial likelihood that she may not prevail on a fraudulent transfer claim against Karleen is also justified. There is clearly evidence that reasonably equivalent value was given to David, specifically the forgiveness of his indebtedness, in exchange for the property Karleen received. There is also clearly evidence that Karleen or Alberta will assert an equitable ownership interest in Lot 21 and the Trustee would also need to prevail against this claim in order to receive the full value of Lot 21.

The Trustee has fairly considered and evaluated the cost of litigating the resulting trust and fraudulent transfer claims. It is likely that any litigation will be expensive and the bankruptcy estate has no resources to fund the litigation.

The Trustee has not given great weight to the difficulty in collection of the judgment but the Trustee has identified a legitimate concern that reducing the judgment to cash may be time consuming, expensive, or not economically feasible. Liquidation of an undivided ½ interest in the Home would be difficult because the undivided interest in the home has little market value, and forcing a sale of the entire Home would require the commencement of an adversary proceeding.

Although Moab Brewers and Moab Brewhouse are operating entities, both companies restrict the sale of member interests, and the member interests are minority interests.

The Trustee has considered the interests of creditor's, and notwithstanding the Bank's objection, has determined that the settlement is in the best interest of creditors. The Bank argues that *Reiss v. Hagmann*[11] dictates that the Bank's view should be given deference in this case and the settlement should not be approved. *Reiss* does not stand for the proposition that a Trustee must defer to the judgment of a sole creditor and it is clearly distinguishable from this case. In *Reiss*, there was only one creditor, the creditor objected to a settlement of a $92,000 claim for a payment of $10,000, and there was no record showing that the trustee or the court had properly evaluated the claim. In reversing the bankruptcy court's approval of the settlement, Tenth Circuit stated that:

> Had the court properly evaluated the bankruptcy trustee's chances of reaching the assets in the Reiss Trust to pay the bona fide debts of the bankruptcy estate, it surely would have evaluated those chances of success at nearly one hundred percent.[12]

In doing so, the Tenth Circuit made it clear that the disapproval of all creditors or a single creditor will not override the thoughtful decision of a trustee stating that: "We do not have to go so far as to hold that the bankruptcy court can approve no settlement of a case to bring assets into the estate over the disapproval of all creditors, or the single creditor, of the estate."[13]

The facts before this Court are easily distinguishable from the facts in *Reiss*. Here, there are two creditors involved with the bankruptcy proceeding. Although the other creditor neither

---

[11] 881 F.2d 890 (10th Cir. 1989).

[12] *Reiss* at 892.

[13] *Id.* at 893.

supported or objected to the Settlement Agreement, the Trustee took into consideration the other creditor's support for an earlier settlement offer of $50,000. Other facts that distinguish *Reiss* are that the Trustee has carefully and thoughtfully evaluated the claims, the Settlement Agreement will generate $100,000 for the estate, and the Trustee believes that there is a significant chance that the Trustee would not prevail in the State Court Lawsuit.

## SUMMARY

The Trustee reviewed and considered a great deal of information regarding both the Settlement Agreement and proceeding with the State Court Lawsuit as an alternative to the Settlement Agreement. In doing so, the Trustee evaluated the alternatives available to her in an effort to maximize the risk-adjusted value to the estate. Having fully considered each of the factors outlined in *Rich Dad* and *Kopexa*, the Court finds that the Trustee has fairly considered the relevant factors, her decision is informed, has been made in the reasonable exercise of her business judgment and clearly falls within the range of reasonableness. The Trustee's motion to approve the Settlement Agreement will be granted.

Because the Trustee's motion to approve Settlement Agreement will be granted, the Bank's motion for court approval to resume prosecution of a pre-petition lawsuit is rendered moot, and will be denied.

______________________________END OF DOCUMENT______________________________

_____ooo0ooo_____

**DESIGNATION OF PARTIES TO BE SERVED**

Service of the foregoing **Findings of Fact and Conclusions of Law** shall be served to the parties and in the manner designated below:

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users and will be served notice of entry of the foregoing Order through the CM/ECF system:

| | |
|---|---|
| Matthew M. Boley | mboley@cohnekinghorn.com, jhasty@cohnekinghorn.com |
| David Charles Castleberry | dcastleberry@mc2b.com, vmerritt@mc2b.com; reception@mc2b.com; cworne@mc2b.com |
| Robert Crockett | rcrockett@fabianvancott.com, kwall@fabianvancott.com |
| Elizabeth R. Loveridge | eloveridge@wklawpc.com, rchristensen@wklawpc.com |
| Elizabeth R. Loveridge tr | eloveridge@wklawpc.com, rchristensen@wklawpc.com; eloveridge@ecf.epiqsystems.com |
| George W. Pratt | gpratt@joneswaldo.com |
| United States Trustee | USTPRegion19.SK.ECF@usdoj.gov |
| Jessica P Wilde | jwilde@joneswaldo.com |
| David R. Williams | dwilliams@wklawpc.com, kmacrae@wklawpc.com |

**By U.S. Mail -** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed R. Civ. P. 5(b).

None